UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN M O'QUINN P.C. d/b/a O'QUINN & LAMINACK, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| vs. | § § | CIVIL ACTION NO. 4:00-cv-2616 |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, *et al.*, | § § § § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

## I.    INTRODUCTION

Pending before the Court are the defendant's, Lexington Insurance Company ("Lexington"), motions for summary judgment (Dkt. Nos. 341 & 342) and the plaintiffs', John M. O'Quinn, P.C. d/b/a O'Quinn & Laminack, John M. O'Quinn & Associates, L.L.P. d/b/a O'Quinn & Laminack, John M. O'Quinn Law Firm, P.L.L.C. and O'Quinn & Laminack (the "plaintiffs" or "the O'Quinn Firm"), cross-motion for summary judgment (Dkt. No. 353).  After having carefully considered the motions, responses, all other matters of record in this case and the applicable authorities, the Court determines that Lexington's motions for summary judgment should be GRANTED; and the plaintiffs' cross-motion for summary judgment should be DENIED.

## II.      RELEVANT BACKGROUND AND PROCEDURAL HISTORY

This is an insurance coverage dispute emanating from two lawsuits previously filed against the O'Quinn Firm—the *Wood*[1] class action filed in 1999 ("*Wood*") and the *Snipes*[2] suit filed in 2002 ("*Snipes*")—by former breast implant clients for, *inter alia*, breach of contract and breach of fiduciary duty, asserting that certain "BI General Expenses taken as a deduction from their settlement disbursement were improper."  (Dkt. No. 345, Ex. 5 & Dkt. No. 349, Ex. 30).

On or about September 26, 1998, National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") issued to the O'Quinn Firm a claims-made and reported Lawyer's Professional Liability Policy, Policy Number 861-88-44, covering the policy period from September 26, 1998 to September 26, 1999 ("1998 Primary Policy").  The 1998 Primary Policy contains a $150,000 self-insured retention with a $5,000,000 limit of liability.  (*See* Dkt. No. 345, Ex. 1 at APP00002.)   National Union also issued a second claims-made Lawyers' Professional Liability Policy, Policy Number 874-18-89, to the O'Quinn Firm covering the policy period from September 26, 2001 to September 26, 2002 ("2001 Primary Policy") (collectively, the "Primary Policies").  The 2001 Primary Policy contains a $500,000 self-insured retention with a $5,000,000 limit of liability.  Both policies provide that "this policy will pay only excess of the retention amounts." (*See* Dkt. No. 349, Ex. 42 at APP00958.)

On or about September 26, 1998, Lexington issued to the O'Quinn Firm an Excess Professional Liability Insurance Policy, Policy Number 599/UP981639, covering the policy period of September 26, 1998 to September 26, 1999 (the "1998 Excess Policy").  The 1998

---

[1] *Martha Wood, et al. v. John M. O'Quinn, P.C. et al*, was filed in the 4th Judicial District Court, Rusk County, Texas on June 4, 1999 and ordered to arbitration in 2004.  A final arbitration Award was entered against the O'Quinn Firm in 2007.  The O'Quinn Firm settled the Award in 2009.

[2] *Leslie Snipes, et. al. v. John M. O'Quinn, et al.*, was filed in the 133rd Judicial District Court, Harris County, Texas on June 21, 2002.  It was non-suited in 2004.

Excess Policy has a $10,000,000 limit of liability.  (Dkt. No. 349, Ex. 48 at APP01025).  A second Excess Professional Liability Insurance Policy, issued by Lexington, Gulf Insurance Company U.K. Limited ("Gulf"), Hiscox Dedicated Corporate Member, Ltd. for Underwriters at Lloyd's ('Hiscox"), and Zurich Specialties London Limited ("Zurich"), Policy Number 599/UP011639, covering the policy period from September 26, 2001 to September 26, 2002 was also issued to the O'Quinn Firm (the "2001 Excess Policy").  (Dkt. No. 349, Ex. 49).   The Excess Policies "follow form" to the underlying Primary Policies and thus, incorporate the same terms, exclusions, conditions and definitions as the Primary Policies.

The events germane to the underlying dispute began several years prior to the issuance of the policies.[3]  During the early 1990s, the O'Quinn Firm began representing women in lawsuits against breast-implant manufacturers.  In 1992, given the abundance of such cases, the Harris County district courts ordered that the cases be consolidated for all pretrial matters due to the common and related liability issues.  Pursuant to the terms of the Harris County consolidation order, the depositions of witnesses to multiple cases in consolidation could only be taken once for use in all cases.  Consequently, around mid-1993, the O'Quinn Firm attempted to formulate an equitable methodology designed to allocate those general expenses allegedly common to all breast implant clients and incurred during the course of the litigation.  Eventually, it resolved to deduct 1.5% out of the gross recovery of each client's settlement for their *pro rata* share of what it referred to as "BI General Expenses."  The O'Quinn Firm's contingent fee contracts, however, did not provide for the deduction of "BI General Expenses" nor did they indicate that clients

---

[3] The background facts are taken, at least in part, from the various orders issued by the Arbitration Panel during the span of the underlying arbitration—all filed as part of the summary judgment record.  (*See* Dkt. No. 347, Exs. Q - T & Dkt. No. 345, Exs. 10 – 17).  *See CVN Group, Inc. v. Delgado*, 95 S.W.3d 234, 238 (Tex. 2002) (internal citation omitted) (reasoning that a valid and final arbitration award upon matters submitted to arbitration "is given the same effect as the judgment of a court of last resort."  "All reasonable presumptions are indulged in favor of the award, and none against it.")

would be charged a pro-rata portion of the general or common expenses or be subject to a 1.5%
deduction from their gross settlement recovery.

In 1995, the O'Quinn Firm's "BI General Expense" account first noted a surplus—the
amount reserved from each client's recovery to cover expenses exceeded the amount of expenses
incurred—and maintained a continuous surplus from May 2000 thereon.  (Dkt. No. 345, Ex. 12
at APP00239).  Despite this surplus, no attempt was made by the O'Quinn Firm to segregate the
withheld funds, inform its clients or dispense a refund "until January 2007—almost seven years
later."  (*Id.*)  In fact, it was not until the filing of the *Wood* lawsuit that the O'Quinn Firm's
former breast implant clients were even informed that it intended to refund any surplus.  (*Id.*).

On June 4, 1999, a group of former breast implant clients of the O'Quinn Firm filed an
action, known as *Wood*, alleging that the O'Quinn Firm's deduction of a pro-rata portion of "BI
General Expenses" from their settlement disbursement was improper.[4]  (Dkt. No. 345, Ex. 5 &
Dkt. No. 349, Ex. 30).   The *Wood* plaintiffs sought class certification, injunctive relief,
disgorgement of improper deductions, forfeiture of the O'Quinn firm's fees, attorneys' fees, pre-
judgment interest, post-judgment interest, and other related relief. (*Id.*).

By letter dated July 26, 1999, National Union agreed to provide the O'Quinn Firm with a
defense to the claims alleged in *Wood* subject to a full and complete reservation of rights.  (Dkt.
No. 345, Ex. 2).  Shortly thereafter, on July 31, 2000, National Union filed the instant action
seeking a declaration of its rights under the 1998 Primary Policy.  (Dkt. No. 1).  On August 31,
2000, the O'Quinn Firm filed a counterclaim against National Union due to its alleged refusal to
pay defense costs, seeking to recover all costs incurred in defending the *Wood* lawsuit.  (Dkt. No.
9).  On or about September 14, 2001, this Court entered a Memorandum Opinion and Order

---

[4] The plaintiffs also alleged a claim relating to an improper MDL Fund deduction, but later abandoned that claim
after such sums were refunded to them.

granting, in part, the O'Quinn Firm's motion for partial summary judgment on National Union's duty to defend.  More specifically, the Court ruled that National Union owed a duty to defend the O'Quinn Firm in the *Wood* lawsuit, but stayed the indemnity issue pending resolution of the underlying litigation.  Afterward, the case was administratively closed.  (*See* Dkt. No. 43.)

On June 21, 2002, Leslie Snipes and Sandra Templeton filed a subsequent suit against the O'Quinn Firm ("*Snipes*") in the 133rd Judicial District Court, Harris County, Texas, asserting allegations nearly identical to those alleged in *Wood*.  (Dkt. No. 349, Ex. 30).  On August 2, 2002, National Union formally acknowledged receipt of information concerning the *Snipes* lawsuit and further stated that since the allegations asserted in *Snipes* were the same as those alleged in *Wood*, *Snipes* would be deemed one "Claim" with *Wood*, "first made" during the 1998 policy period when *Wood* was filed and subject to the 1998 Primary Policy limits.[5]  (Dkt. No. 349, Ex. 44).

Subsequently, in the *Snipes* lawsuit, plaintiff Leslie Snipes, filed a motion for continuance and plea in abatement, seeking to have the *Snipes* lawsuit abated in favor of the *Wood* lawsuit.  Specifically, she alleged the following:

> **The above Rusk County suit involving the same identical legal and factual issues and parties[sic] defendant**.  Abatement of a lawsuit due to the pendency of a prior lawsuit with an 'inherent interrelation of the subject matter exists in two pending lawsuits, a plea in abatement in the second action must be granted .' . . . **Here the interrelationship is identical except for this plaintiff**.  The parties have discussed [c]onsolidation of the two cases into the earlier Rusk County suit, and/or for discovery and/or arbitration since Plaintiff here would be a member of the class sought to be certified and other relief.

---

[5] Lexington likewise acknowledged receipt of the *Snipes* lawsuit and reserved its rights thereto.  (See Dkt. No. 349, Ex. 60, at 147 – 161.)

(Dkt. No. 346, Ex. J.) (emphasis added).  On April 10, 2002, the Court entered an Order granting the motion for continuance and plea in abatement.  *Snipes* was non-suited on May 14, 2004.[6] Thereafter, Leslie Snipes and Sandra Templeton joined the *Wood* class action as members.

In 1999, the O'Quinn Firm sought an order compelling arbitration.  (Dkt. No. 345, Ex. 6). The Texas Supreme Court eventually decided that the class arbitration issue was for the arbitrators to decide, not the trial court.  *In re Wood*, 140 S.W.3d 367, 368 (Tex. 2004).  On November 15, 2004, the 4th Judicial District Court, Rusk County, ordered *Wood* to arbitration pursuant to the Federal Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association ("AAA").  (Dkt. No. 345, Ex. 9).[7]  The arbitration persisted for nearly three years and its proceedings consisted of a sequence of phased hearings, comprising transcripts exceeding more than 1,000 pages.  (*Id.*, Exs. 18A – 18E).  Pursuant to a Class Determination Award entered by the Panel, the arbitrators, after a hearing, certified a class consisting of all of the O'Quinn Firm's former breast implant clients who signed a contingent fee contract with an arbitration provision and a settlement sheet containing a deduction for BI General Expenses.[8]  (*Id.*, Ex. 11.).

Subsequent to the issuance of its Class Determination Award, the Panel entered a series of orders establishing the following:  (1) the O'Quinn Firm's contingent fee contracts were "unambiguous", "do not allow for the deduction of BI General Expenses", and "a reasonable

---

[6] Sandra Templeton actually non-suited her claims on February 25, 2004 and Leslie Snipes non-suited her claims on May 14, 2004.

[7] In its Order, the trial court specifically ORDERED, in part, as follows:

> that the arbitrators hearing the case are specifically authorized to have the full limit of authority to determine the issues related to class action and to address and resolve all issues related to due process rights of putative class members and to determine all class action issues, including, without limitation, the issue of class certification, the issue of the definition of the class, and the issue of whether proceeding on class or individual claims is proper.

(Dkt. No. 345, Ex. 9 at APP00182 – 183).

[8] The former clients whose contingent fee contracts included an express provision waiving the right to participate in a class action were excluded from the class.

person in the circumstances of [the *Wood*] Plaintiffs would [not] have construed the Fee Agreements *at the time of their execution* as providing for such a deduction" (Dkt. No. 345, Ex. 12 at APP00234); (2) "there could not have been an expectation by [the O'Quinn Firm]—much less the pre-1993 [*Wood*] Plaintiffs—that the Fee Agreements would cover BI General Expenses when they were drafted because that category of expense did not exist (Dkt. No. 345, Ex. 12 at APP00235); (3) "despite the creation of the BI General [Expense] category in mid-1993, the Fee Agreements were not altered in any manner explaining such a significant change" (*Id.*); (4) Mr. Laminack, one of the O'Quinn Firm's lawyers primarily responsible for handling the breast implant litigation, "candidly agreed that 'some of the charges on the list [of expenditures posted as BI General Expenses were] not appropriate'" (Dkt. No. 345, Ex. 12 at APP00237; Dkt. No. 345, Ex. 18A at APP00306 - 307); (5) the Majority of the Panel remained unpersuaded by the O'Quinn Firm's position that BI General Expenses "were never actually 'charged' to the [*Wood*] Plaintiffs" and that "the firm had always planned to go back and audit BI General Expenses and remove any inappropriate charges" (Dkt. No. 345, Ex. 12 at APP00238); (6) "the BI General Expense account first had a surplus in 1995" and maintained a continuous one from May 2000 thereon (Id. at APP00239); (7) "[d]espite this surplus, no attempt was made to refund [the *Wood*] Plaintiffs' money until January 2007" (*Id.*); (8) "until very recently, the withheld money was not segregated in any manner, rather it was used to pay down the [O'Quinn Firm's] breast implant litigation credit line" (*Id.* at APP00238); (9) the "total amount of BI General Expenses deducted from [the *Wood*] Plaintiffs' settlements was approximately $18.9 million" (*Id.* at APP00239); and (10) "[the O'Quinn Firm's] conduct is a clear and serious violation of the duties owed by a lawyer" (Dkt. No. 345, Ex. 14 at APP00268).

Further, the Panel held that: (1) for the O'Quinn Firm's improper deduction of BI General Expenses "an appropriate remedy is the return by [the O'Quinn Firm] of all BI General Expenses improperly deducted from the Class Members' settlement distributions" (Dkt. No. 345, Ex. 14 at APP00261); and (2) for its breach of fiduciary duty "[the O'Quinn Firm] should forfeit $25 million of the fees" out of "about $263.4 million" in fees received by it. (*Id.* at APP00268 - 271).

On September 26, 2007, the Panel issued a final arbitration award (the "Final Award"). (Dkt. No. 345, Ex. 16).[9]  The Final Award held the O'Quinn Firm liable for damages totaling Forty-One Million Four Hundred Sixty-Five Thousand Nine Hundred Fifty and No/100 Dollars ($41,465,950.00), in the following specific amounts: (1) Nine Million Nine Hundred Seventy-Nine Thousand Three Hundred Sixty-Four and No/100 Dollars ($9,979,364.00), for breach of contract; (2) Two Million Four Hundred Ninety-Four Thousand Eight Hundred Forty-One and No/100 Dollars ($2,494,841.00), for attorneys' fees on the breach of contract claim; (3) Three Million Nine Hundred Ninety-One Thousand Seven Hundred Forty-Five and No/100 Dollars ($3,991,745.00), in interest on the breach of contract damages; and (4) Twenty-Five Million and No/100 Dollars for fee forfeiture ($25,000,000.00), and other related relief. (*See* Dkt. No. 345, Ex. 16).  On October 12, 2007, the Rusk County court entered a final judgment confirming the Final Award in all respects. (Dkt. No. 345, Ex. 20).  On December 4, 2009, the O'Quinn Firm, on its own, settled the Final Award for $46.5 million. (*Id.*, Ex. 21).

Thereafter, this action was reopened for further proceedings. Discovery has been conducted and is now closed.  The O'Quinn Firm and all of the other defendant insurers, save

---

[9] The Final Award was erroneously dated October 26, 2007, but was amended the next day to reflect a September 27, 2007 date of entry.

Lexington, have settled.[10]  Thus, the O'Quinn Firm's only remaining claims are those against Lexington, the excess carrier on the 1998 and 2001 Excess Policies.  Specifically, the O'Quinn Firm seeks a declaration that:  (1) the complaints in the *Wood* and *Snipes* lawsuits against the O'Quinn Firm and/or the demands made upon it allege one or more "Wrongful Act(s)" as the term is defined under the applicable policies; (2) the complaints in the *Wood* and *Snipes* lawsuits seek the recovery of sums which constitute a "Loss" as that term is defined under the applicable policies; (3) such "Loss" is not excluded under the applicable policies; (4) such "Loss" exceeds the limits of the applicable policies; (5) Lexington is required to indemnify the O'Quinn Firm up to the limits of liability under the 1998 Excess Policy for any amount of Loss in excess of the 1998 Primary Policy's limits of liability; and (6) Lexington is required to indemnify the O'Quinn Firm up to the limits of liability under the 2001 Excess Policy for any amount of Loss in excess of the 2001 Primary Policy's limits of liability.  (Dkt. No. 86, ¶ 74.)

## III.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 authorizes summary judgment against a party who fails to make a sufficient showing of the existence of an element essential to that party's case and on which that party bears the burden at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*).  The movant bears the initial burden of "informing the Court of the basis of its motion" and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323; *see also, Martinez v. Schlumber, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003).  Summary judgment is appropriate if "the pleadings, the discovery and disclosure

---

[10] Specifically, while the summary judgment motions, discussed *infra*, were under submission to this Court, the O'Quinn Firm entered into a settlement with National Union.  Separately, the O'Quinn Firm also settled with Hiscox, Zurich and Gulf.  Upon the filing of the parties' agreed motions for dismissal, the O'Quinn Firm's claims against National Union, Hiscox, Zurich and Gulf were dismissed from this litigation.  (*See* Dkt. Nos. 384 & 396).

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

If the movant meets its burden, the burden then shifts to the nonmovant to "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996) (citing *Tubacex*, *Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995); *Little*, 37 F.3d at 1075).   "To meet this burden, the nonmovant must 'identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s].'"   *Stults*, 76 F.3d at 656 (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994)).   The nonmovant may not satisfy its burden "with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (internal quotation marks and citations omitted).   Instead, it "must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *American Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).

"A fact is material only if its resolution would affect the outcome of the action . . . and an issue is genuine only 'if the evidence is sufficient for a reasonable jury to return a verdict for the [nonmovant].'"   *Wiley v. State Farm Fire and Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009) (internal citations omitted).   When determining whether the nonmovant has established a genuine issue of material fact, a reviewing court must construe "all facts and inferences . . . in the light most favorable to the [nonmovant]."   *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (citing *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003)).   Likewise, all "factual controversies [are to be resolved] in favor of the [nonmovant], but

only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Boudreaux*, 402 F.3d at 540 (citing *Little*, 37 F.3d at 1075 (emphasis omitted)).   Nonetheless, a reviewing court may not "weigh the evidence or evaluate the credibility of witnesses." *Boudreaux*, 402 F.3d at 540 (citing *Morris*, 144 F.3d at 380).  Thus, "[t]he appropriate inquiry [on summary judgment] is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Septimus v. Univ. of Hous.*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

## IV.   ANALYSIS AND DISCUSSION

### A.   Construction of Insurance Policies Under Texas Law

Under Texas law, which governs this diversity suit, the same general rules that govern the interpretation of contracts govern the interpretation of insurance policies, and a policy must be interpreted to effectuate the intent of the parties at the time the policy was formed.[11]  *See*, *Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.*, 322 F.3d 847, 853 (5th Cir. 2003); *Progressive County Mut. Ins. Co. v. Sink*, 107 S.W.3d 547, 551 (Tex. 2003).  Terms within an insurance contract are given "their plain, ordinary, and generally accepted meaning unless the contract itself shows that particular definitions are used to replace that meaning." *Bituminous Cas. Corp. v. Maxey*, 110 S.W.3d 203, 208-09 (Tex. App. – Houston [1st Dist.] 2003, pet. denied) (internal citation omitted).

If an insurance contract is worded such that it "can be given a definite or certain legal meaning," then it is unambiguous and enforceable as written. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995).  Only if an insurance contract is susceptible to multiple reasonable interpretations must a court adopt the interpretation most

---

[11] The parties agree that Texas substantive law applies in this diversity lawsuit.

favorable to the insured.  *Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520.  Nevertheless, a court will not find a contract ambiguous merely because the parties offer contradictory interpretations.  *See*, *Cent. States, Se. & Sw. Areas Pension Fund v. Creative Dev. Co.*, 232 F.3d 406, 414 n. 28 (5th Cir. 2000) (quoting *Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir. 1985) (internal quotation marks and citation omitted)) ("A Court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings."); *see also*, *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 465 (Tex. 1998).

"The insured bears the initial burden of showing that there is coverage, while the insurer bears the burden of proving the applicability of any exclusions in the policy" that permit the insurer to deny coverage.  *Guar. Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998) (citing *Telepak v. United Servs. Auto. Ass'n*, 887 S.W.2d 506, 507 (Tex. Civ. App. – San Antonio 1994, writ denied); *Venture Encoding Serv., Inc. v. Atl. Mut. Ins. Co.*, 107 S.W.3d 729, 733 (Tex. App. – Fort Worth 2003, pet. denied) (stating that the Texas Insurance Code places the burden on the insurer to prove any exception to coverage).  Once the insurer has established that an exclusion applies, the burden shifts back to the insured to prove that an exception to the exclusion applies.  *Guar. Nat'l Ins. Co.*, 143 F.3d at 193 (internal citation omitted).

### B.  Pertinent Policy Provisions

With these principles in mind, the Court now turns to the relevant policy language.  Since the Excess Policies "follow form" to the provisions contained in the Primary Policies, a review of the relevant language contained therein is necessary.  The Primary Policies provide, in pertinent part, as follows:

**NOTICE:  THIS IS A CLAIMS MADE FORM.  EXCEPT AS STATED HEREIN, THE COVERAGE OF THIS POLICY IS LIMITED**

**GENERALLY TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD . . . .”**

(Dkt. No. 345, Ex. 1 at APP00001; Dkt. No. 349, Ex. 42 at APP00957.)  Section A of each of the

Primary Policies’ Insuring Agreements states, in pertinent part, the following:

## I.  INSURING AGREEMENT

### A.  Coverage
This policy will pay on the behalf of the Insured Loss arising from a Claim first made against the Insured during the Policy Period . . . and reported in writing to [National Union] pursuant to the terms of this policy for any actual or alleged Wrongful Act whenever or wherever such Wrongful Act has been committed by:
1.  the Insured in the rendering or failing to render Professional Legal Services for others; and

2.  any other person or entity in the rendering or failing to render Professional Legal Services for others on the behalf of the Firm for whose Wrongful Act an Insured is legally responsible.

(Dkt. No. 345, Ex. 1 at APP00003; Dkt. No. 349, Ex. 42 at APP00959.).

The following pertinent definitions are contained in the Primary Policies:

## II.  DEFINITIONS

### B.  “Claim” means:

1.  A written demand for money or services;
   **. . .**

3.  a judicial civil proceeding;
   **. . .**

5.  any other regulatory, administrative, or arbitrative proceeding.
   **. . .**

### D.  “Defense Costs” means:

1.  reasonable and necessary fees, costs, and expenses incurred by the Company, or incurred by the Insured with the written consent of the Company, . . . resulting from the investigation, adjustment, defense, or appeal of a Claim against any Insured . . . .

2.  all costs taxed against an Insured in a Claim defended by the Company and interest which accrues after the entry of a judgment and before the Company has tendered or deposited in court, or otherwise, such judgment amount covered by the terms of this policy and for which the Insured is legally liable.

. . .

K.  **"Interrelated Wrongful Act(s)" means** Wrongful Acts which are the same, related, or continuous; or Wrongful Acts which arise from the same, related, or common nexus of facts.  Claims can allege Interrelated Wrongful Acts regardless of whether such claims involve the same or different claimants, Insureds, or legal causes of action.

L. **"Loss" means** damages, judgments, settlements and Defense Costs; provided, however, that Loss does not include fines, penalties, sanctions, taxes, punitive or exemplary damages, the multiplied portion of multiplied damages, reimbursement of legal fees, costs, or expenses, any amount for which the Insured is not financially liable or for which is without legal recourse to the Insured, or matters which may be deemed uninsurable under the law pursuant to which this policy is construed.

. . .

P.  **"Professional Legal Services" means** legal services and activities (1) performed as a lawyer . . . ; (2) provided by a lawyer in connection with any bar association, its governing board, or any of its committees;  or (3) provided by an Employee of the Firm in connection with assisting a lawyer to perform the activities described in (1) or (2) above for others on the behalf of the Firm.

Q.  **"Wrongful Act" means** an act, error, or omission, including but not limited to breach of contract or duty (including but not limited to Fiduciary duty) and Personal Injury.  "Personal Injury" means allegations of libel, slander, or other defamatory or disparaging material or publication; utterance in violation of an individual's right of privacy; false arrest, detention, or imprisonment; wrongful entry, eviction, or other invasion of the right of private occupancy; or malicious prosecution.

(Dkt. No. 345, Ex. 1 at APP0004 – 6; Dkt. No. 349, Ex. 42 at APP00960 - 62.).

The Primary Policies also contain the following relevant exclusion:

### III.   EXCLUSIONS

This policy excludes coverage for any Loss in connection with a Claim:

. . .

    B.  arising out of, based upon, or attributable to a criminal, fraudulent, malicious (other than malicious prosecution), or dishonest Wrongful Act on the part of any Insured, or the gaining of any profit or advantage to which an Insured was not legally entitled. . . . This exclusion will not apply to Defense Costs incurred in defending any such Claims.

(Dkt. No. 345, Ex. 1 at APP00007; Dkt. No. 349, Ex. 42 at APP00963.)  Relevant endorsements included in the Primary Policies provide:

### ENDORSEMENTS

Endorsement No. 4 of the 1998 Primary Policy, and Endorsement No. 5 of the 2001 Primary Policy, deletes National Union's duty to defend in its entirety, replacing it with an obligation, subject to all other terms of the Primary Policies, for National Union to pay "Defense Costs" "which are in compliance with the Company's Litigation Management Program Guidelines."

(Dkt. No. 345, Ex. 1 at APP00017; Dkt. No. 349, Ex. 42 at APP00974.)

### THE EXCESS POLICIES

The Excess Policies state, in relevant part, as follows:

To pay on behalf of the Assured for claim or claims first made against the Assured during the period of insurance hereon up to this Policy's amount of liability (as hereinafter specified) in the aggregate, the excess of the Underlying Policy/ies limits (as hereinafter specified) in the aggregate, the latter amount being the subject of Indemnity Policy/ies (as hereinafter specified) or any Policy/ies issued in substitution or renewal thereof for the same amount effected by the Assured and hereinafter referred to as "the Underlying Policy/ies.

. . .

    1. Liability is [sic] to pay under this Policy shall not attach unless and until the Underwriters of the Underlying Policy/ies shall have paid or

> have admitted liability or have been held liable to pay, the full amount
> of their indemnity inclusive of costs and expenses.

(Dkt. No. 349 at APP01027 at ¶ 1; APP01049 at ¶ 1; APP01193 at ¶ 1.).  Additionally, the

Excess Policies expressly state that the O'Quinn Firm is required to obtain the excess insurer's

consent prior to any settlement of a claim.  More specifically, the Excess Policies provide the

following:

> 4. In the event of a claim arising to which the Underwriters hereon may
> be liable to contribute, no costs shall be incurred on their behalf
> without their consent being first obtained (such consent not to be
> unreasonably withheld).  No settlement of a claim shall be effected by
> the Assured for such a sum as will involve this Policy without the
> consent of Underwriters hereon.

(APP01027 at ¶ 4; APP01049 at ¶ 4; APP01193 at ¶ 4.).  The Excess Policies further state that

"[e]xcept as otherwise provided herein this Policy is subject to the same terms, exclusions,

conditions and definitions as the Policy of the Primary Insurers . . . ." (Dkt. No. 349 at APP01028

at ¶ 7; APP01050 at ¶ 7; APP01194 at ¶ 7.)

## C.  The *Wood/Snipes* Lawsuits Constitute One Claim First Made in 1999

As a threshold matter, the parties do not dispute that the plaintiffs and/or the O'Quinn

Firm qualify as "Insureds" under the Primary Policies.[12]  It is also undisputed that both the *Wood*

---

[12] The term "**Insured**" is defined within the meaning of the Primary Policies to mean:

1. The Firm;
2. Any person or entity which was, is, or . . . hereafter becomes:
   a.  a Partner of the Firm:
   b.  an Employee of the Firm who is a lawyer or law firm ("Employed Lawyer");
   c.  an Employee of the Firm who is neither a lawyer nor law firm;
   d.  any other person or entity who is a lawyer or law firm and who is:  (i) designated as "counsel"
      or "of counsel" to or (ii) engaged as an Independent contractor or on a per diem basis by the
      Firm, but in either case only while rendering or failing to render Professional Legal Services
      for others on behalf of the Firm; and
   e.  the estate, heirs, executors, administrators, assigns, and legal representatives of any person or
      entity who previously qualified as an Insured in the event of such Insured's death, incapacity,
      insolvency, or bankruptcy but only to the extent that such Insured would otherwise be
      provided coverage under this policy.

(Dkt. No. 345, Ex. 1 at APP00005 – 6; Dkt. No. 349, Ex. 42 at APP00961 – 62, APP00973.)

and *Snipes* lawsuits constitute, at a minimum, a "Claim" within the meaning of the Policies.  The Primary Policies define a "Claim" in pertinent part, as "a written demand for money or services", "a judicial civil proceeding" or "any other regulatory, administrative, or arbitrative proceeding." Accordingly, this Court has determined that the *Wood* suit constituted a "Claim" within the meaning of the Policies.  (*See* Dkt. No. 43 at p. 6.).  Similarly, the *Snipes* suit represents a "Claim" within the meaning of the Policies.

Pursuant to Condition D of the Primary Policies, however, "[a]ll Claims alleging a Wrongful Act or Interrelated Wrongful Acts regardless of the number of Claims, Insureds, or claimants ***are considered to be one Claim***.  Further, all such Claims are considered ***first made*** at the time the ***first Claim*** alleging such Wrongful Act or Interrelated Wrongful Act was ***first made***."  (Dkt. No. 345, Ex. 1 at APP00008; Dkt. No. 349, Ex. 42 at APP00964.) (emphasis added).  Interrelated Wrongful Acts are defined within the meaning of the Primary Policies to include "[w]rongful [a]cts which are the same, related, or continuous; or [w]rongful [a]cts which arise from the same, related, or common nexus of facts." (Dkt. No. 345, Ex. 1 at APP00004; Dkt. No. 349, Ex. 42 at APP00960.).  "Claims can allege Interrelated Wrongful Acts regardless of whether such claims involve the same or different claimants, Insureds, or legal causes of action." (*Id.*)

The *Wood* and *Snipes* lawsuits both alleged that the O'Quinn Firm had improperly billed its clients by means of a BI General Expense deduction taken from each client's settlement disbursement.[13]  A review of the petitions filed in both cases indicates that the cases contain the same legal and factual allegations and arise from a common nexus of facts.  In fact, Leslie Snipes, in her motion for continuance and verified plea in abatement filed in the *Snipes* lawsuit

---

[13] The plaintiffs also alleged a claim relating to an improper MDL Fund deduction, but later abandoned that claim.

in the 133rd Harris County Judicial District Court, specifically alleged that the *Snipes* and *Wood* lawsuits "involv[ed] the ***same identical legal and factual issues*** and part[y] defendant[s]." (Dkt. No. 341, Ex. J at 3 – 4.)  She further alleged that the "interrelationship [between the cases] is identical except for th[e] plaintiff[s]."  (*Id.*)  Even more telling is the fact that both Snipes and Templeton, the only two plaintiffs in the *Snipes* lawsuit, non-suited their claims in *Snipes* in 2004, subsequently joined the *Wood* class action as unnamed plaintiffs, and received settlement proceeds as part of the *Wood* settlement payout in December 2009.  (Dkt. No. 347, Ex. V.)

When determining whether two lawsuits allege interrelated wrongful acts under Texas law, a court "must read the underlying petitions in light of the insurance policy's provisions, and focus the analysis on the 'origin of the damages.'"  *Reeves Cty. v. Hous. Cas. Co.*, 356 S.W.3d 664, 670 (Tex. App. – El Paso 2011).  Here, under the plain language of the Primary Policies, all claims alleging the same or interrelated wrongful acts are considered *one* claim *first made* when the first claim is filed.  When employing the reasoning set forth in *Reeves* coupled with the plain language of the Primary Policies, the Court determines that while *Snipes* was filed in 2002, for purposes of determining which policy period applies, it constitutes a single claim *first made* when *Wood*---the suit encompassing the first claim alleging the same and/or Interrelated Wrongful Acts--was *first filed* during the 1998 policy period.  Therefore, *Snipes* is subject to the 1998 Primary Policy and not the 2001 Primary Policy.  The O'Quinn Firm's argument that the *Wood* and *Snipes* lawsuits are not related is specious at best, especially in light of the overwhelming evidence to the contrary.  Hence, the Court determines that no genuine issue of material fact exists regarding whether the *Wood* and *Snipes* lawsuits allege the same and/or Interrelated Wrongful Acts or constitute a single Claim first made during the 1998 policy period. Further, since the *Snipes* suit was non-suited in 2004, no evidence has been adduced establishing

that the O'Quinn Firm incurred expenses in excess of its deductible on *Snipes* during its

pendency.[14]   Accordingly, Lexington is entitled to a summary judgment that there is no coverage

available for the *Snipes* lawsuit under the 2001 Policies.

### 1.   "Loss" Incurred Within the Meaning of the Policies

As set forth above, the Insuring Agreement of the Primary Policies, to which the Excess

Policies follow form, provide, in relevant part, that "[t]his policy will pay on the behalf of the

Insured *Loss* arising from a Claim first made against the Insured during the Policy Period."  (Dkt.

No. 345, Ex. 1 at APP00003; Dkt. No. 349, Ex. 42 at APP00959.) (emphasis added).  The term

"**Loss**" is defined within the Primary Policies as:

> damages, judgments, settlements and Defense Costs; provided, however, that
> Loss ***does not include fines, penalties, sanctions***, taxes, punitive or exemplary
> damages, the multiplied portion of multiplied damages, ***reimbursement of legal***
> ***fees, costs, or expenses***, any amount for which the Insured is not financially liable
> or for which is without legal recourse to the Insured, ***or matters which may be***
> ***deemed uninsurable under the law*** pursuant to which this policy is construed.

(Dkt. No. 345, Ex. 1 at APP00006; Dkt. No. 349, Ex. 42 at APP00962.) (emphasis added).

In this case, the O'Quinn Firm maintains that based on the definition of the term "*Loss*"

as defined in the Primary Policies, it incurred an actual covered *Loss* in the amount of $46

million.  (Dkt. No. 53 at 11 – 14.).   The O'Quinn Firm allocates its *Loss* as follows:   (1)

$30,724,462.50 for breach of contract and breach of fiduciary duty damages; (2) $10,241,487.50

for an award of attorneys' fees; and (3) $5,000,000.00 for accrued post-judgment interest.

Specifically, it contends that $30,724,462.50 was distributed to the *Wood* and *Snipes* plaintiffs

for actual damages awarded for breach of contract, breach of fiduciary duty and pre-judgment

---

[14] Even assuming that the O'Quinn Firm were entitled to coverage under the 2001 Primary Policy, it is highly
doubtful that coverage under the 2001 Excess Policy would ever be triggered because under the terms of the
O'Quinn Firm's settlement with National Union, National Union did not pay, did not admit liability, and was not
held liable to pay the full amount of its indemnity under the 2001 Primary Policy. (Dkt. Nos. 380, 381 & 385).  The
plain language of the 2001 Excess Policy requires otherwise.  *See Citigroup Inc. v. St. Paul Mercury Ins. Co.*, 649
F.3d 367 (5th Cir. 2011) (holding that excess coverage in four policies was not triggered until primary insurer
satisfied the requirements necessary to trigger the excess insurers' coverage and paid the full amount of its limits)

interest accrued on the breach of contract damages.  It contends that "[t]his $30,724,462.50 payment falls within the plain meaning of *damages*, which is included in the [Primary Policies'] definition of Loss."  (Dkt. No. 353 at 13).  Additionally, it avers that the $10,241,487.50 payment, which was awarded to the *Wood* and *Snipes* plaintiffs for attorneys' fees, falls within the plan meaning of *damages* as well because it is merely a percentage of the breach of contract and breach of fiduciary duty damages Award.  It further insists that since "the award of attorneys' fees was part of the Judgment and paid in the Settlement, this amount falls within the meaning of *judgment* and *settlement*."  (*Id.*)  Lastly, the O'Quinn Firm argues that the $5,000,000.00 payment made by it to the *Wood* and *Snipes* plaintiffs for accrued postjudgment interest is a Defense Cost, falls within the meaning of *damages*, and thus, constitutes a *Loss*.

Lexington, in contrast, maintains that the Primary Policies' definition of the term "*Loss*" distinctly does not include within its coverage any matter "deemed uninsurable under the law.[15]" (Dkt. No. 343 at 22).  Lexington contends that because the *Wood* and *Snipes* Claim was plainly restitutionary in nature, the O'Quinn Firm is incapable of satisfying its burden to prove a covered "*Loss*" under the Policies.  As support for its position, Lexington relies on two cases, both of which are instructive here.  *See In re TransTexas Gas Corp.*, 597 F.3d 298 (5th Cir. 2010); *Nortex Oil & Gas Corp. v. Harbor Ins. Co.*, 456 S.W.2d 489 (Tex. Civ. App. –Dallas 1970, no writ).

In *Nortex*, Humble Oil & Refining Co., sued Nortex for using slant drilling techniques that crossed the boundary lines of its leases and extended into adjacent leases jointly owned by it and Texaco, claiming that Nortex converted its property by wrongfully appropriating and selling oil belonging to it.  *Nortex*, 456 S.W.2d at 490.  Texaco intervened in the actions to protect its

---

[15] Lexington also argues that "any matter falling within the fortuity doctrine is deemed uninsurable under Texas law." (Dkt. No. 342 at 22).  The Court, however, finds it unnecessary to address its argument in this regard at this juncture.

interest.  *Id.*  The parties eventually settled and Nortex, thereafter, made demand for payment upon its insurer seeking indemnity on the basis that the settlement amounted to a "Loss" under its excess liability insurance policy.  *Id.* at 490 – 91.  Its insurer denied the claim and refused payment.  Afterward, Nortex initiated a lawsuit in a Texas state court, which rendered judgment for Nortex's insurer.  Nortex appealed.  The Texas appellate court rejected its argument, reasoning:

> When Nortex settled the claims of Humble and Texaco it did not sustain a 'loss' within the meaning of the insurance contract; it was merely paying for oil it had removed and sold from the land of Humble and Texaco.  An insured (under such a policy as we have here) does not sustain a covered loss by restoring to its rightful owners that which the insured, having no right thereto, has inadvertently acquired . . . .  The insurer did not contract to indemnify the insured for disgorging that to which it was not entitled in the first place, or for being deprived of profits to which it was not entitled.

*Id.* at 493 – 94.

In *In re TransTexas Gas Corp.*, the Fifth Circuit, in examining the *Nortex* and *Level 3 Commc'ns Inc. v. Fed. Ins. Co.*, 272 F.3d 908 (7th Cir. 2001)[16] cases, both relied upon by Judge Atlas in construing the term "**Loss**" under an insurance policy,[17] which, like the Primary Policies at issue, did not include "matters which may be deemed uninsurable under the law", acknowledged agreement with the following reasoning:  "a 'loss' within the meaning of an insurance contract does not include the restoration of an ill-gotten gain." *In re TransTexas Gas Corp.*, 597 F.3d 298, 310 (5th Cir. 2010) (quoting *Level 3*, 272 F.3d at 910).  The Fifth Circuit

---

[16] The directors' and officers' insurance policy maintained by Level 3 defined "Loss" as "the total amount which any Insured Person becomes legally obligated to pay . . . including, but not limited to . . . settlements." *Level 3*, 272 F.3d at 909.

[17] In the case before Judge Atlas, National Union filed suit against Stanley, CEO of TransTexas, and U.S. Bank, the liquidating bankruptcy trustee, seeking a declaratory judgment that it was not liable under an executive and organization liability insurance policy for a judgment entered by the bankruptcy court against Stanley because the bankruptcy court's judgment did not constitute a "Loss" under the policy. *See National Union Fire Ins. Co. of Pittsburgh, PA v. U.S. Bank, Nat. Ass'n*, 4:07-CV-1958, 2008 WL 2405975, 1 (S.D. Tex. June 11, 2008)

remarked that an "insured incurs no loss within the meaning of the insurance contract by being compelled to return property that it had stolen, even if a more polite word than 'stolen' is used to characterize the claim for the property's return." *TransTexas Gas*, 597 F.3d at 310 (quoting *Level 3*, 272 F.3d at 911). It further reasoned that the fact that the defendant CEO might have been legally entitled to payment in a lesser amount was of no moment because the fact remained that the bankruptcy court's judgment against him was "restitutionary in nature." *Id.* at 310 – 11.

The O'Quinn Firm attempts to distinguish the cases relied upon by Lexington by contending that the cases are inapposite because there was never any question that the contingent fee contracts authorized them to recoup *all* court costs and expenses of litigation, but rather that the contingent fee contracts did not specifically authorize recoupment *through BI General Expenses*. (Dkt. No. 353 at 32) (emphasis added). It contends that the aforementioned fact is "critical because it negates any argument that the O'Quinn Firm's breach was for stealing any property or for wrongfully-receiving any sort of benefit." *Id.* It also argues that: (1) the *Wood* and *Snipes* plaintiffs never sued them for *restitution* and never sought *restitution*; (2) the Panel did not enter an award for *restitution*, *but damages* for breach of contract and breach of fiduciary duty; and (3) the Award and Settlement do not reference the words *restitution* or *restitutionary*. While the Court agrees that the O'Quinn Firm suffered a *Loss* in the colloquial sense that the Panel awarded damages against it, the Court, nevertheless, remains unpersuaded by the O'Quinn Firm's attempts to differentiate the cases proffered as support by Lexington.[18]

Moreover, under the Primary Policies, "*Loss*" expressly does not include "reimbursement of legal fees, costs or expenses" or "fines, penalties, [or] sanctions." Undoubtedly, even a cursory review of the petitions filed in the *Wood* and *Snipes* lawsuits indicates that the plaintiffs,

---

[18] Even the Panel noted in its findings that "[e]ven if [the O'Quinn Firm's] suggested interpretation of the Fee Agreements was accepted . . . the money still did not belong to [it]." (Dkt. No. 345, Ex. 12 at APP00239).

by way of their suits, sought the reimbursement of expenses the O'Quinn Firm had improperly deducted from their settlement disbursements along with legal fees that it had collected.  (Dkt No. 345, Ex. 14 at APP00271).  The Final Award entered against the O'Quinn Firm expressly required "the return by O'Quinn of all BI General Expenses improperly deducted from the Class members' settlement distributions," together with prejudgment interest and attorneys' fees, as well as the forfeiture of "$25 million of the fees [received from] the Class."  (*Id.*).  Thus, the Court concludes that the O'Quinn Firm has failed to establish that it sustained a "*Loss*" within the meaning of the Policies.  Accordingly, because the Panel's Final Award against it does not qualify as a "*Loss*" under the Primary Policies and because the O'Quinn Firm has failed to satisfy its burden to prove a covered "*Loss*" under the Policies, Lexington is entitled to a summary judgment.

### 2.   "Professional Legal Services" Within the Meaning of the Policies

The plaintiffs in both the *Wood* and *Snipes* lawsuits alleged the same and/or similar claims.  In *Wood*, the plaintiffs alleged that the O'Quinn Firm failed to perform its obligations under the contingent fee contract with them "by improperly charging the plaintiffs BI General Expenses and MDL [Fund] deductions that were not specifically provided for in the [contingent fee contract] and by calculating fees and reimbursements in a manner other than as provided by the [contingent fee contract]."  (Dkt. No. 204, Ex. 5 at APP0095, ¶ 40).  The plaintiffs also alleged that the O'Quinn Firm "breached its fiduciary duty to [them] by improperly deducting BI General and MDL amounts from [their] settlement proceeds."  (*Id.*, Ex. 5 at APP0096, ¶ 41).  As a consequence, the plaintiffs sought class certification, injunctive relief, disgorgement of the improper billings, forfeiture of fees and other related relief.  (*Id.*)  *Snipes* involved the same factual and legal issues as *Wood*.  (*Id.*, Ex. 5 at APP00930; APP00898 – 916).

The Insuring Agreement of the Primary Policies, to which the Excess Policies follow form, provides, in pertinent part, as follows:

> This policy will pay on the behalf of the Insured Loss arising from a Claim . . . for any actual or alleged Wrongful Act whenever or wherever such Wrongful Act has been committed by:
>
> 1. the Insured in the rendering or failing to render Professional Legal Services for others; and
>
> 2. any other person or entity in the rendering or failing to render Professional Legal Services for others on the behalf of the Firm for whose Wrongful Act an Insured is legally responsible.

(Dkt. No. 345, Ex. 1 at APP00003; Dkt. No. 349, Ex. 42 at APP00959.).  "Professional Legal Services" is defined within the meaning of the Primary Polices as "legal services and activities [] performed as a lawyer."  (Dkt. No. 345, Ex. 1 at APP00006; Dkt. No. 349, Ex. 42 at APP00962).

Lexington argues that the Wrongful Acts alleged in *Wood* and *Snipes* arose solely out of the O'Quinn Firm's improper billing practices, which it contends are not "professional legal services."  Rather, it maintains that "professional legal services" consist of "only those acts which use the inherent skills *typified* by that professional, not *all* acts associated with the profession."  *Gregg & Valby, LLP v. Great Am. Ins. Co*., 316 F. Supp.2d 505, 513 (S.D. Tex. 2004) (citing *Atlantic Lloyd's Ins. Co. of Tex. v. Susman & Godfrey, L.L.P.*, 982 S.W.2d 472, 477 (Tex. App. – Dallas 1998, pet. denied)).  In contrast, the O'Quinn Firm, in its motion for summary judgment, maintains that the breaches alleged in *Wood* and *Snipes* were committed while rendering "Professional Legal Services" because the O'Quinn Firm was representing the *Wood* and *Snipes* plaintiffs in breast-implant litigation when the breaches occurred.  (*See* Dkt. No. 353 at 24).  Thus, they surmise that "[b]ecause representing clients in litigation is a legal service and activity that is performed exclusively by lawyers, the O'Quinn Firm was necessarily performing Professional Legal Services.  (*Id*.)  Further, the O'Quinn Firm avers that it

"performed legal services and activities as [both a lawyer and] a Fiduciary because the Panel found that it breached a fiduciary duty to its clients that arose from the attorney-client relationship." (*Id.*)

This Court, however, is more inclined to agree with Lexington's depiction of the claims alleged in *Wood* and *Snipes* and is not persuaded by the O'Quinn Firm's valiant effort to characterize its billing and/or fee-setting practices as an integral part of the legal representation that it provided to the *Wood* and *Snipes* plaintiffs. *See Gregg*, 316 F. Supp.2d at 512 (citing *Tacon Mech. Contractors, Inc. v. Aetna Cas. & Sur. Co.*, 65 F.3d 486, 488 (5th Cir. 1995)( "A party's particular characterization of a claim cannot conceal its true nature.").   This determination is in harmony with multiple other courts that have contemplated this very issue. Such courts have repeatedly held that billing and/or fee-setting practices do not constitute "professional services." *See Gregg*, 316 F. Supp.2d at 513 (citing *Atlantic Lloyd's*, 982 S.W.2d at 476 – 77) (reasoning that "even tasks performed by lawyers are not considered 'professional services' if they are ordinary activities that can be completed by those lacking legal knowledge and skill."); *see Med. Records Assocs., Inc. v. Am. Empire Surplus Lines Ins. Co.*, 142 F.3d 512 (1st Cir. 1998) ("Indeed, setting a price for services and sending bills are functions of every business."); *Visiting Nurse Ass'n of Greater Phil. v. St. Paul Fire & Marine Ins. Co.*, 65 F.3d 1097, 1101 (3rd Cir. 1995) (recognizing the division between the professional and commercial aspects of the practice of law, the Third Circuit reasoned:  "The professional aspect 'involves the rendering of legal advice to and advocacy on behalf of clients for which the attorney is held to a certain minimum professional and ethical standard[].'  On the other hand, the commercial aspect involves 'the setting up and running of a business,' including such tasks as securing office space, hiring staff, paying bills, and collecting on accounts receivable.").  In *Reliance Nat. Ins. Co. v.*

*Sears, Roebuck & Co., Inc.*, for example, a Massachusetts appellate court, when deciding whether an attorney's billing practice comprised professional legal services sufficient to trigger coverage under a professional liability insurance policy for a fraudulent billing claim asserted against an attorney insured, held the following:

> [W]e decide that the billing function of a lawyer is not a professional service. Billing for legal services does not draw on special learning acquired through rigorous intellectual training.  We are not aware that courses in billing clients appear in law school curricula.  The billing function is largely ministerial.  There are elements of experience and judgment in billing for legal services, but the same goes for pricing shoes.  As billing is not a professional service, it does not come within the coverage of a professional liability insurance policy.

*Reliance Nat. Ins. Co. v. Sears, Roebuck & Co., Inc.*, 58 Mass. App. Ct. 645, 648, 792 N. E.2d 145, 148 (Mass. App. Ct. 2003).

Similarly, this Court concludes that the claims alleged in *Wood* and *Snipes*, at their core, do not equate to "Professional Legal Services," but rather to billing practices which do not require specialized knowledge and legal skill inherent to lawyers.  Because the O'Quinn Firm's improper billing practices do not constitute "professional legal services", the O'Quinn Firm cannot meet its burden of proving that the *Wood* and/or *Snipe*s Claim falls within the Policies' Insuring Agreements.  Accordingly, a summary judgment in Lexington's favor is appropriate.

### 3.   Exclusion B of the Policies Also Precludes Coverage

Alternatively, this Court determines that Exclusion B also excludes the O'Quinn Firm's claim from coverage under the Policies.  Particularly, the Primary Policies exclude coverage for any Loss relating to a Claim:

> B. arising out of, based upon, or attributable to a criminal, fraudulent, malicious (other than malicious prosecution), or dishonest Wrongful Act on the part of any Insured, or the gaining of any profit or advantage to which an Insured was not legally entitled. . . . This exclusion will not apply to Defense Costs incurred in defending any such Claims.

(Dkt. No. 345, Ex. 1 at APP00007; Dkt. No. 349, Ex. 42 at APP00963.).  The parties do not insinuate that the language set forth above is ambiguous.  Therefore, because the provision is not ambiguous, the Court will employ the plain meaning of its terms.  *See Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 369 (5th Cir. 1998) (when exclusion is susceptible to one interpretation, courts employ the exclusion as written); *see also National Union Fire Ins. Co. of Pittsburgh, PA v. U.S. Bank, Nat. Ass'n* , 4:07-CV-1958, 2008 WL 2405975, 1 (S.D. Tex. June 11, 2008) (reasoning that exclusionary language is unambiguous and both phrases--"profit or advantage" and "legally entitled"-- have been applied by courts without explanation or difficulty).

Indeed, the series of orders and awards entered by the Panel with respect to the *Wood* arbitration established that the O'Quinn Firm received a "profit or advantage to which [it] was not legally entitled" by, *inter alia*:  (1) failing to disclose the BI General Expense deduction or even mentioning charging clients for a pro-rata portion of general and/or common expenses; (2) allocating such undisclosed expenses among clients; (3) not segregating the withheld money in any manner and using it to pay down the O'Quinn Firm's breast implant litigation credit line; (4) improperly designating items such as professional association dues, public relations fees, other lawyer's fees, flowers, fundraising and office overhead as BI General Expenses; and (5) making no attempt to refund any client's money until January 2007, despite maintaining a continuous surplus since May 2000.  (Dkt. No. 345, Ex. 12 at Ex. APP00237 – 238.)

The O'Quinn Firm contends that Exclusion B is inapplicable in this case because:  (1) the evidence shows that it did not gain any profit or advantage, but merely recouped its expenses through the general-expense methodology; (2) Lexington's interpretation of Exclusion B is unreasonable based on the Primary Policies' language and renders coverage illusory; and (3)

Lexington's interpretation is unreasonable and thus, the rules of contract construction prohibit the Court from adopting it. (*See* Dkt No. 353 at 37).

Lexington, in opposition, argues that the undisputed facts establish that the *Wood/Snipes* Claim arose out of the O'Quinn Firm's "gaining profit or advantage to which it was not legally entitled." This Court is inclined to agree. Accordingly, the Court is of the opinion that the Panel's Final Award finding that the O'Quinn Firm's contingent fee contracts did not allow for the deduction of BI General Expenses and requiring them to return all BI General Expenses improperly deducted from the Class members' settlement distributions, together with prejudgment interest, attorneys' fees, and the forfeiture of $25 million in fees received is sufficient to satisfy the "profit or advantage to which [it] was not legally entitled" exclusion.[19]

## V.   CONCLUSION

Based on the foregoing, the Court determines that Lexington has met its burden to show that the O'Quinn Firm is not entitled to coverage under the Excess Policies for the various reasons set forth above. The O'Quinn Firm has not demonstrated a genuine issue of material fact supporting its arguments in support of coverage. Therefore, a summary judgment in Lexington's favor is appropriate. Accordingly, Lexington's motions for summary judgment are GRANTED; and the O'Quinn Firm's cross-motion for summary judgment is DENIED.

It is so **ORDERED**.

SIGNED on this 17th day of July, 2014.

_____
Kenneth M. Hoyt
United States District Judge

---

[19] The O'Quinn Firm also argues that the Innocent Insured provision applies to save coverage under Exclusion B. However, in light of its holding, this Court need not address this argument or the alternative theories alleged by Lexington because it determines coverage to be unavailable on various other grounds.